721 S.E.2d 768

**CHARLESTON COUNTY DEPARTMENT
OF SOCIAL SERVICES, Respondent,**

v.

**Christine MARCCUCI, Sean Taylor and John Doe, Defendants,**

**of whom Sean Taylor is the Appellant
and Sean Taylor, Appellant,**

v.

**Helen Taylor and Donald Shappell, Respondents.**

**No. 27049.**

Supreme Court of South Carolina.

Heard May 5, 2011.

Decided Oct. 3, 2011.

Jason Scott Luck, of the Seibels Law Firm, P.A., of Charleston, for Appellant.

Frampton Durban, Jr., Chief Counsel Charleston County Department of Social Services, of N. Charleston, and Ms. Helen Taylor, of Alpha, New Jersey, for Respondents.

Sean Fredrick Keefer, of Charleston, and Virginia Cravens Ravenel, of Columbia, for Guardian ad Litem.

Justice HEARN.

Sean Taylor appeals from an order which terminated his parental rights to his six-year-old daughter on three grounds: willful failure to visit, willful failure to support, and the child had been in foster care for fifteen out of the previous twenty-two months. Following a review of the record, we hold that the Charleston County Department of Social Services (DSS) did not meet its burden with respect to the first two grounds and the child's placement in foster care for at least fifteen of the last twenty-two months is not a sufficient ground for termination of Taylor's rights under the facts of this case. Accordingly, we reverse.

## FACTUAL/PROCEDURAL BACKGROUND

The minor child who is the subject of this action was born on September 16, 2005, to Taylor and Christine Marccuci. In February 2006, she was removed from her parents' custody by the New Jersey Social Services Agency when Taylor was arrested for excessively disciplining Marccuci's older child[1] and Marccuci could not be located. During this removal period, which lasted approximately five months, his daughter

---

[1]. Taylor struck the child on his back when the child moved during a spanking, leaving a mark that the child's teachers noticed. They accordingly called social services, which then instituted proceedings against Taylor.

was placed in the home of Taylor's parents, Helen Taylor and Donald Shappell (Grandparents).[2] Taylor pled guilty to fourth degree child cruelty,[3] enrolled in a pre-trial intervention program, and was placed on probation. Thereafter, his daughter was returned to his custody. They apparently continued to live together in New Jersey until September 2007, at which point Marccuci left for South Carolina and took the minor child with her. Taylor followed her to South Carolina, ostensibly to find his daughter.

Taylor moved in with Marccuci and his daughter at the Value Inn Hotel in North Charleston in October, planning to stay until he earned enough money to return to New Jersey with his child. On January 23, 2008, police came to the hotel looking for Marccuci after she failed to show up at her job.[4] Following a background check on Taylor, the police inexplicably and erroneously reported he had an outstanding warrant for rape in New Jersey.[5] Consequently, Taylor was arrested and taken away in chains, and his daughter, then two years old, was placed in DSS protective custody.

Taylor's travel to South Carolina was a violation of his probation, which ultimately resulted in his incarceration in New Jersey for five months. However, Taylor was still in jail in South Carolina at the time of the probable cause hearing concerning the child's removal held on January 28, 2008, and appeared *pro se*.[6] The Grandparents traveled to South Car-

---

**2.** Although they have never married, at the time of the termination of parental rights (TPR) hearing Shappell and Ms. Taylor had lived together for twenty-nine years and owned a home together. Furthermore, Shappell has been both a father figure to Taylor and a grandfather figure to the minor child.

**3.** This charge is the lowest level of criminal offense in New Jersey. *See* N.J. Stat. Ann. § 2C:43–1; *id.* § 9:6–3.

**4.** Marccuci apparently has not been heard from since, and did not file an answer or appear at any hearing in either the removal or TPR action.

**5.** The police officer did not testify in this matter and there was no explanation why the police erroneously reported Taylor's violation of probation charge as an outstanding warrant for rape.

**6.** Shortly after the hearing, he was extradited to New Jersey, where he served the remainder of his sentence for his probation violation.

olina to be present as well. An agreement was reached wherein the Grandparents were added as party defendants "for the purposes of possible placement for the minor child." Moreover, both Taylor and Marccuci were temporarily restrained from having any contact with their daughter, pending further order of the family court. Because DSS requested a priority placement evaluation of the Grandparents' residence in New Jersey, the family court issued a separate order for an expedited home study pursuant to an interstate compact with New Jersey regarding child custody. That order was issued the same day as the hearing, but DSS did not provide the New Jersey Department of Children and Families (NJDCF) with the necessary information until the Grandparents retained an attorney who urged DSS to do so. The letter approving the Grandparents' home as a licensed foster home finally was issued by NJDCF on August 20, 2008, some eight months after the court's order.

Taylor was released from jail on June 3, 2008. However, he remained subject to the order restraining him from having contact with his daughter and admittedly made no motion to rescind that order, relying instead on his belief that the plan was still for the child to be placed with his parents in New Jersey after the interstate compact study had been completed. Following completion of that home study in August 2008, no transfer of custody occurred so the Grandparents moved for an expedited hearing to have it done. On December 16, 2008, that hearing was held and the family court, by order dated March 9, 2009, mandated a two-week transition period with Ms. Taylor [7] in Charleston where she would "participate in a therapeutic clarification" with her granddaughter. It is noteworthy that by this point in time, the minor child had been in seven foster placements, none of which had apparently involved a transition period for "therapeutic clarification."

The Grandparents attempted to obtain relief from the two-week transition period, but were unsuccessful and ultimately traveled to South Carolina for the transition at their own expense and began visits with the child, which were taped at

---

7. Although Shappell had been made a party defendant to this action at the probable cause hearing, DSS consistently referred to him as Ms. Taylor's "paramour," and the family court ordered the transition period only for Ms. Taylor.

the office of Dr. Don Elsey, the Clinical Director of the Dee Norton Low Country Children's Center. Despite staying approximately eleven days, the Grandparents were only permitted to visit with the child twice before having to return to work in New Jersey. Furthermore, they were advised by DSS that the interstate compact had "run out" and their designation as foster parents was no longer viable; even if the Grandparents completed the two-week transition period, they were informed they would not be able to bring the minor child back to New Jersey until the compact was renewed. Although the Grandparents returned to South Carolina once more after this visit, DSS denied them visitation with the minor child and told them there would be no more visitation.

From the time this little girl was taken into custody until the issuance of the merits order on the removal, this case can best be described as a procedural morass. The action began in a timely manner on January 28, 2008, with the probable cause hearing.[8] The merits hearing was scheduled for February 28, but the court continued it upon the motion of Taylor's guardian *ad litem* once it was clear the case was contested. At some point, the merits hearing was set for June 4. However, a pre-trial hearing scheduled for May 13 was continued until June 18 because no judge was available; the June 4 merits hearing accordingly was rescheduled for October 1. For some reason not apparent in the record, this hearing was continued again. Frustrated at the lack of progress in this case, the Grandparents moved for an expedited placement hearing, but that too was continued on December 8 for unknown reasons. On January 22, 2009, the hearing on the expedited motion was again continued.[9] The merits hearing

8. While the order that emanated from this hearing was the result of an agreement, the lone affidavit filed in support of DSS retaining temporary custody was from the DSS caseworker and stated, with respect to Taylor: "It was further reported that Mr. Sean Taylor was arrested and will be extradited to New Jersey where he will be charged with rape." It is not clear when DSS recognized the error in this statement, but DSS appears to have relied on it nonetheless in justifying the removal of the child.

9. It appears from the record that this is the same expedited hearing that was resolved through the order dated March 9, 2009. That order, however, noted the hearing was held on December 16, 2008, by phone. If our reading of the record is correct, we are puzzled as to why the

was then scheduled for April 30, nearly fifteen months after the minor child was removed by DSS, to no avail: it was continued for lack of notice. The hearing was again continued on May 4 for the same reason. It was not until July 10—far beyond the thirty-day limit provided for by statute—that the merits hearing was held, and the final order was not issued until August 3,[10] over one-and-a-half years after the child was placed in protective custody. The final order authorized DSS to forego efforts at reunification and pursue TPR. By the time the removal action was complete, the child had lived in seven different foster homes and no less than seven different family court judges had been involved.

Before the removal action had been resolved, however, DSS had already initiated this TPR action against Taylor and Marccuci alleging willful failure to visit, willful failure to support, and the fact that the minor child had been in foster care for at least fifteen of the last twenty-two months. On August 10, 2010, the family court issued a final order terminating Taylor and Marccuci's rights on all of the alleged grounds. This appeal followed.

## LAW/ANALYSIS

It is well settled that before parental rights can be forever terminated, the alleged grounds for the termination must be established by clear and convincing evidence. *Richberg v. Dawson,* 278 S.C. 356, 357, 296 S.E.2d 338, 339 (1982); *Charleston Cnty. Dep't of Soc. Servs. v. Jackson,* 368 S.C. 87, 95, 627 S.E.2d 765, 770 (Ct.App.2006). Moreover, on appeal,

---

hearing held on December 16 was not brought to the attention of the family court in January when it issued an order extending the continuance it granted December 8 for the same matter. We are also concerned that it took three months for the court to issue an order following an *expedited* hearing regarding the placement of a minor child with her own family, particularly when it had been established by that time that Taylor had no outstanding rape charge in New Jersey and he had already served his time for the probation violation.

**10.** This order apparently is the final or merits order in the removal action, although it is captioned "Final Order Judicial Review and Permanence Planning." Both the TPR court and DSS appear to treat it as the final merits order, and it is the only order regarding removal that seems to make all the findings required by Section 63–7–1660(B) of the South Carolina Code (2008).

we may make our own determination from our review of the record as to whether the grounds for termination are supported by clear and convincing evidence. *S.C. Dep't of Soc. Servs. v. Cummings,* 345 S.C. 288, 293, 547 S.E.2d 506, 509 (Ct.App.2001).

██ Section 63–7–2570 of the South Carolina Code (Supp. 2010) provides the various ways in which a parent's rights can be terminated. That section provides as grounds for TPR, in part:

(3) The child has lived outside the home of either parent for a period of six months, and during that time the parent has willfully failed to visit the child. The court may attach little or no weight to incidental visitations, but it must be shown that the parent was not prevented from visiting by the party having custody or by court order. The distance of the child's placement from the parent's home must be taken into consideration when determining the ability to visit.

(4) The child has lived outside the home of either parent for a period of six months, and during that time the parent has willfully failed to support the child.

*Id.* § 63–7–2570(3)–(4). Willful conduct is that which "evinces a settled purpose to forego parental duties ... because it manifests a conscious indifference to the rights of the child to receive support and consortium from the parent." *S.C. Dep't of Soc. Servs. v. Broome,* 307 S.C. 48, 53, 413 S.E.2d 835, 839 (1992). Under our standard of review, we find DSS has failed to show either willful failure to visit or support the minor child.

██ While Taylor cannot be excused for violating his probation by coming to South Carolina in search of Marccuci and the minor child, it appears that DSS's case against him was initially fueled by the erroneous information supplied by the police that he had an outstanding warrant for rape in New Jersey. He was then enjoined from visiting with his daughter at the probable cause hearing, which presumably would not have been warranted but for the erroneous information about the pending New Jersey charge. Thereafter, Taylor was extradited to New Jersey where he served a five month prison sentence for violating his probation, during which it was impossible for him to visit his daughter. Afterwards, he was

subject to the court order preventing any contact between him and his daughter. The mere fact that Taylor did not seek to have this order rescinded or altered does not demonstrate any willful failure to visit on his part; his lawful obedience of a valid court order, which was based largely on his belief that his daughter was soon going to be returned to his parents' custody in New Jersey, should not be used to mount a case against him for willful failure to visit. It is also of no moment that Taylor initially agreed to the order enjoining his contact with the child. Taylor, who appeared *pro se* at the probable cause hearing, was facing extradition to and jail time in New Jersey for his probation violation. Furthermore, Taylor spent the next eighteen months fighting for custody of the minor child, or, alternatively, in support of her placement with the Grandparents. Therefore, DSS has failed to prove by clear and convincing evidence that Taylor willfully failed to visit the child while she was in protective custody.

 Additionally, we disagree that there was clear and convincing evidence that Taylor willfully failed to support the minor child. Taylor testified that he had no income while incarcerated, had no job for some time when released, and that he tried to support the child once he did have gainful employment but was unaware of the location of the child or even how to pay any support to DSS. Once a court order was in place for Taylor to pay support for the child, he immediately paid on time and was never in arrears. This conduct certainly does not evince a settled purpose to forego his obligation to support his child, and we therefore hold the family court erred in terminating Taylor's rights on this ground.

 The family court also terminated Taylor's parental rights on the ground that the minor child had been in foster care for at least fifteen out of the last twenty-two months, per section 63–7–2570(8). While the family court's determination is technically correct, the facts of this case militate against strict adherence to section 63–7–2570(8). Indeed, this case represents an "instance[ ] where this statutory ground would not support termination of parental rights." *Jackson,* 368 S.C. at 102 n. 8, 627 S.E.2d at 773 n. 8 (citing *S.C. Dep't of Soc. Servs. v. Cochran,* 356 S.C. 413, 420, 589 S.E.2d 753, 756 (2003)

(Pleicones, J., concurring)). Where there is "substantial evidence that much of the delay ... is attributable to the acts of others," a parent's rights should not be terminated based solely on the fact that the child has spent greater than fifteen months in foster care. *Cochran*, 356 S.C. at 420, 589 S.E.2d at 756.

Here, there is substantial evidence that this little girl languished unduly in foster care not because of any actions, or inactions, by Taylor, but because the delays generated and road blocks erected in the removal action made it impossible for the parties to regain legal custody of her prior to the expiration of the fifteen month period. Several continuances of the removal action were ordered, only one of which was requested by Taylor through his guardian. Taylor continued to contest his daughter being in the custody of DSS throughout the entire process, despite not being able to appear himself in many instances because he was incarcerated and subject to his probation. In fact, DSS initiated the TPR proceedings while the removal action—the very action that would determine whether the child was properly placed into foster care in the first place—was still pending and contested. Taking our own view of the evidence, we find that Taylor did not sit idly by while his child was in foster care, but rather he was stymied by the system charged with the responsibility of protecting this child and reuniting her with her father if possible. The various continuances requested by other parties were largely the reason the child had remained in foster care for fifteen months at the time the TPR action was filed, and under these circumstances, we hold that this ground should not serve as the basis for terminating this father's parental rights.

As a final matter, we turn briefly to the purpose behind the TPR statute itself:

[T]o establish procedures for the reasonable and compassionate termination of parental rights where children are abused, neglected, or abandoned in order to protect the health and welfare of these children and make them eligible for adoption by persons who will provide a suitable home environment and the love and care necessary for a happy, healthful, and productive life.

S.C.Code Ann. § 20–7–1560 (1984). Thus, the very purpose behind the statute is to provide for children who are "abused, neglected, or abandoned" and place them with people who will nourish and protect them.

However, this child was neither abused, neglected, nor abandoned [11] by Taylor. Indeed, it is undisputed that at the time she was taken into protective custody, she was healthy, clean, and neatly dressed. Moreover, there is no indication in the record that she had any behavioral problems at the time she was removed from her father. In fact, Dr. Elsey testified that when he saw her on March 7, 2008, "[s]he was a verbal, very pleasant little two year old." Although he stated she had symptoms of Reactive Attachment Disorder, he also testified that this disorder arises in children who have been separated from their parents.

We also express our concern about the numerous unexplained delays in the removal action, as well as DSS's apparent reluctance to return this little girl to the Grandparents despite the fact that they previously had served as foster parents. Moreover, DSS's insistence on a two-week "therapeutic clarification" period for the Grandparents even after the interstate compact had been complied with seems especially inexplicable, particularly given the child's placement with seven sets of strangers where no transition period was required. While removing this little girl from her father's care and custody in the face of his probation violation may have been warranted, the sole basis for probable cause contained in the caseworker's affidavit was the outstanding rape warrant, not the probation violation. Moreover, the continued procedural road blocks which prevented the expeditious return of this child had tragic consequences for this family, especially for this little girl who has been deprived of the opportunity to develop a relationship with her father over the past three and half years.

---

11. Taylor certainly did not abandon his daughter in the traditional sense. He was arrested and she was placed in DSS protective custody ostensibly because of an outstanding warrant for rape in New Jersey which turned out to be nonexistent. While Taylor initially agreed to stay away from his daughter until the criminal charges were sorted out, he did so primarily based on his belief that his daughter would be expeditiously placed with his parents.

## CONCLUSION

Accordingly, we hold that Taylor's parental rights should not be terminated based on willful failure to support, willful failure to visit, or that the minor child has been in foster care for more than fifteen months. The order of the family court is therefore reversed,[12] and we direct DSS to immediately implement a plan for the reunification of Taylor and his daughter or, in the alternative, for placement of the minor child with the Grandparents in New Jersey until that reunification can be achieved, effective immediately upon the filing of this opinion.

TOAL, C.J., BEATTY, and KITTREDGE, JJ., concur.

PLEICONES, J., dissenting in a separate opinion.

Justice PLEICONES.

I respectfully dissent and would affirm the order terminating appellant's parental rights as I find clear and convincing evidence supports the family court's decision. *Richland County Dep't of Soc. Serv. v. Earles*, 330 S.C. 24, 496 S.E.2d 864 (1998). Appellant's remaining issues are not properly before the Court. *Robinson v. Estate of Harris*, 391 S.C. 114, 705 S.E.2d 41 (2011) (unchallenged ruling, whether correct or not, is law of the case); *S.C. Dep't of Transp. v. Horry County*, 391 S.C. 76, 705 S.E.2d 21 (2011) (issue must be raised and ruled upon to be preserved for appellate review).

---

**12.** Because our holding is dispositive of this appeal, we do not reach the other issues raised by Taylor. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (declining to address additional issues when one issue is dispositive).